**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| JAMIE WAGES,<br>on behalf of Plaintiff and the class<br>members described herein,<br><br>Plaintiff,<br><br>v.<br><br>WLCC LENDING JEM d/b/a<br>EXPLORE CREDIT;<br>HIVE FINANCIAL SYSTEMS, LLC;<br>WAKPAMNI LAKE COMMUNITY<br>CORPORATION;<br>WAKPAMNI LAKE COMMUNITY<br>CORPORATION II d/b/a WLCC II;<br>BRET A. CRANDALL;<br>RAYCEN RAINES, III, also known as<br>RAYCEN AMERICAN HORSE RAINES<br>and formerly known as RAYCEN<br>BALLARD;<br>and JOHN DOES 1-20,<br><br>Defendants. | ) |

**COMPLAINT – CLASS ACTION**

1. Plaintiff, Jamie Wages, brings this action against Defendants (a) WLCC Lending JEM d/b/a Explore Credit, (b) Hive Financial Systems, LLC, (c) Wakpamni Lake Community Corporation, (d) Wakpamni Lake Community Corporation II d/b/a WLCC II, (e) Bret A. Crandall, (f) Raycen Raines, III, also known as Raycen American Horse Raines and formerly known as Raycen Ballard, and (g) John Does 1-20 to secure redress for usurious and illegal loans (such as Exhibit A) made to Indiana residents.

2. Plaintiff seeks damages under the Indiana Consumer Credit Code (Count I) and treble damages under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1964 (Count II).

**JURISDICTION AND VENUE**

3. The Court has subject matter jurisdiction under 28 U.S.C. § 1331 (general federal

question), 28 U.S.C. § 1332(d) (Class Action Fairness Act), 15 U.S.C. § 1692k (FDCPA), 18 U.S.C. § 1964 (RICO), 28 U.S.C. § 1337 (interstate commerce), and 28 U.S.C. § 1367 (supplemental jurisdiction).

4. On information and belief, there are more than 100 class members and the amount in controversy, on a classwide basis, exceeds $5 million, exclusive of interest and costs.

5. This Court has personal jurisdiction over Defendants because they:

a. Knowingly participated in the making and collection of unlawful loans to Indiana residents. In similar actions against purported "tribal" lenders, courts have held that personal jurisdiction over the persons involved in making the loans exists in the state where the borrower obtained a loan via the Internet, and in which loan funds were disbursed via ACH transfer. *Gingras v. Rosette*, 5:15cv101, 2016 U.S. Dist. LEXIS 66833, 2016 WL 2932163, at *2-3, *9 (D. Vt. May 18, 2016)*, aff'd sub nom. Gingras v. Think Fin., Inc.*, 922 F.3d 112 (2d Cir. 2019) (finding that tribal lending entity's contacts with Vermont "would have been sufficient to subject [the tribal entity] to personal jurisdiction in Vermont" for purposes of claims for violations of state and federal law, including state usury laws and RICO, where tribal entity operated a website that advertised loans in Vermont, sent emails and loan applications to Vermont consumers and transferred loan principal to consumers' Vermont bank accounts); *Duggan v. Martorello,* 18cv12277, 2022 U.S. Dist. LEXIS 58075, at *33-34, 2022 WL 952183 (D. Mass. Mar. 30, 2022); *Dawkins v. Blue Dart Ventures,* 8:20cv2353, 2021 U.S. Dist. LEXIS 130297 (M.D. Fla. Apr. 1, 2021).

b. Selected which states to offer loans in, thereby targeting those states. *Illinois v. Hemi Group, LLC,* 622 F.3d 754, 760 (7th Cir. 2010).

6. Venue is proper because acts to obtain and collect the loans impacted Plaintiff in Indiana.

7. Article III is satisfied because actions for statutory damages and invalidation of loans for usury were entertained by the courts of England and the United States in 1787. English Usury Act of 1713, 12 Anne Session 2 c. 17. All thirteen original American states replaced the English

usury statutes with their own usury laws between 1641 and 1791. Christopher L. Peterson, *Usury Law, Payday Loans, and Statutory Sleight of Hand: Salience Distortion in American Credit Pricing Limits*, 92 Minnesota Law Review 1110, 1116-18 (April 2008), summarizing statutes allowing 5% to 8% interest.

## PARTIES

8. Plaintiff Jamie Wages is a natural person and a citizen of Indiana who at all times relevant has resided in Indianapolis, Indiana.

9. Defendant WLCC Lending JEM d/b/a Explore Credit is an entity that maintains a place of business in Georgia. Its operations center uses the address PO Box 260269, Atlanta, GA 30326.

10. Defendant Hive Financial Systems, LLC is a limited liability company organized under the law of Wyoming. Its principal office address is 3340 Peachtree Rd. NE, Suite 300, Atlanta, GA, 30326. Its registered agent and office is Corporation Service Company, 2 Sun Court, Suite 400, Peachtree Corners, GA, 30092, or Corporation Service Company, 1821 Logan Ave., Cheyenne, WY 82001.

11. Defendant Wakpamni Lake Community Corporation ("WLCC") is a corporation organized under the law of the Oglala Sioux Tribe.

12. Defendant Wakpamni Lake Community Corporation II ("WLCC II") is a corporation organized under the law of the Oglala Sioux Tribe.

13. Defendant Raycen Raines, III, also known as Raycen American Horse Raines and formerly known as Raycen Ballard ("Raines"), is a citizen of South Dakota believed to reside at 3503 Chapel Hill Road, Rapid City, SD 57702. On information and belief, he is a board member and Chief Executive Officer of WLCC.

14. On information and belief, Raines has taken a lead role in originating the Internet lending business complained of herein, and in organizing WLCC and acquiring capital for lending.

15. Defendant Bret A. Crandall ("Crandall") is an individual believed to be a citizen of

Maryland and to reside at 1707 Randall Dr., Solon, IA 52333-9424, or 1413 Foxwood Court, Annapolis, MD 21409. On information and belief, he is employed by WLCC as director of compliance.

16. Geneva Lone Hill ("Hill"), now deceased, was a citizen of South Dakota and president of WLCC.

17. John Does 1-20 are other natural or artificial persons who participated in the Internet lending scheme complained of herein.

## FACTS

## FACTS RELATING TO INTERNET LENDING BUSINESS

18. Raines, Hill and others developed a plan to make illegal high-interest loans over the Internet, while evading liability for such loans by purporting to use the tribal immunity of the Oglala Sioux tribe.

19. Raines and Hill initially asked the Economic Development Office of the Oglala Sioux Tribe to enter into a business arrangement for the conduct of a high-interest consumer lending business.

20. The Economic Development Office declined to enter into any such business arrangement.

21. Raines and Hill thereupon formed WLCC and later WLCC II.

22. On information and belief, at a January 2012 meeting of the Wakpamni district of the Oglala Sioux Tribe, Raines stated, "these big industries," referring to online lenders, "need to move onto sovereign land," and that "My advice is don't take out a payday loan. . . Let the white people take out the loan and let us make money off them." Eamon Javers, *How Some Payday Lenders Charge Over 700% on Loans,* CNBC.com, Sept. 17, 2012, https://www.cnbc.com/id/49035819.

23. While WLCC and WLCC II purport to be tribal entities, they are in fact operating contrary to the wishes of tribal authorities.

24. A large number of entities were chartered for the purpose of conducting high-

interest Internet lending, for the principal benefit of non-tribal persons.

25. These included: WLCC Lending JEM d/b/a Explore Credit; WLCC Lending FFG d/b/a Falcon Funding Group; WLCC Lending BGL d/b/a Bison Green Lending; WLCC Lending FHC, d/b/a Fox Hills Cash; WLCC II d/b/a Arrowhead Advance; WLCC Lending AIL d/b/a Good Loans Fast; WLCC Lending TLP d/b/a Rapid Loan; Black Hawk Financial d/b/a Title Loan Fast; WLCC Lending MSS d/b/a MyBackWallet; WLCC Lending GEG d/b/a TheGanEdenGroup.com; Checkadvanceusa.net; WLCC Lending CFC d/b/a Consumer First Credit; Green Circle Lending; Rolling Plains Cash; Cash on Cloud 9; Easy Cash Online Store; BaysideCash.com; Whisper Rock, LLC; BeachsideCash.com; Blvdcash.com; Fast Money Store; FiresideCash.com; Seaside Dollar; SeasidePayday.com; WLCC Lending MFT d/b/a Merit Financial Trust; and WLCC Lending MFT d/b/a Ocean Park Funding.

26. The actual lending operations were carried out and continue to be carried out in locations other than tribal lands.

27. For example, Defendant WLCC Lending JEM d/b/a Explore Credit has an operations center that uses the address P.O. Box 260269, Atlanta, GA 30326.

28. Credit information is pulled on behalf of "Explore Credit/ Hive Financial Systems."

29. WLCC Lending JEM d/b/a Explore Credit claims: "We are a sovereign enterprise, an economic development arm and instrumentality of, and wholly owned and conducted by, the Wakpamni Lake Community, a political subdivision of the Oglala Sioux Tribe." (Exhibit A)

30. In fact, the lending operations conducted under the name WLCC Lending JEM d/b/a Explore Credit are conducted by and for the benefit of Defendant Hive Financial Systems, LLC, a limited liability company organized under the law of Wyoming with a principal place of business in Georgia.

31. On information and belief, mail sent to P.O. Box 260269, Atlanta, GA 30326, is received by Hive Financial.

32. The operations that are not conducted on tribal land include lead generation,

marketing, funding, underwriting, payment processing, and collection.

33. No member of the Tribe participates in the day to day lending operations.

34. The funds for making the loans come from Hive Financial and its investors and affiliates.

35. On information and belief, the server used by WLCC Lending JEM d/b/a Explore Credit is located in the vicinity of Wichita, Kansas.

36. Raines and Hill made Crandall director of compliance for WLCC. Crandall implemented the lending practices engaged in by WLCC and WLCC II.

37. In fact, the Oglala Tribe receives no benefit from the lending operations.

38. WLCC and WLCC II receive a small fee for each loan made.

39. The funds lent are transferred by ACH credit to the borrowers' bank accounts throughout the United States.

40. Repayment of the loans is made by ACH debit from the borrowers' bank accounts throughout the United States.

**SOVEREIGN IMMUNITY AS A DEFENSE TO STATE USURY LAWS**

41. An entity must function as a legitimate "arm of the tribe" in order to fall under that tribe's sovereign immunity. *See Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1183 (10th Cir. 2010).

42. To determine if a particular entity is entitled to sovereign immunity, the majority of courts have adopted the framework laid out in *Breakthrough*, which analyzed "(1) [the entities'] method of creation; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the tribe has over the entities; (4) whether the tribe intended for the entities to have tribal sovereign immunity; (5) the financial relationship between the tribe and the entities; and (6) whether the purposes of tribal sovereign immunity are served by granting immunity to the entities." *Breakthrough* at 1183, 1187-88.

43. The test must be applied to exclude sham "tribal lending entities." As explained in

*Ransom v. Greatplains Fin., LLC*, 2025 U.S. App. LEXIS 19539, *11-13, 148 F.4th 141:

> . . . But we find it less useful to think up post hoc policy rationales and more helpful to focus on why courts recognized the immunity in the first place: to respect the tribe's governance and to protect its treasury. Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe, 498 U.S. 505, 509 (1991) (explaining that immunity respects tribes'"inherent sovereign authority"); Breakthrough, 629 F.3d at 1183 (noting that one rationale for immunity was to protect tribes' treasuries). Respecting the tribe's sovereignty corresponds to factor (3): A suit against an entity drags the sovereign into court only if the entity is under the sovereign's control. And protecting the tribe's treasury maps on to factor (5).
>
> Between those two factors, the effect on the tribe's treasury may matter more. That factor is the core of sovereign immunity, shielding the fisc so governments can decide whether to spend finite funds on healthcare, education, pensions, or satisfying individual legal claims. Richard H. Fallon, Jr., Of Legislative Courts, Administrative Agencies, and Article III, 101 Harv. L. Rev. 915, 937 (1988) ("[S]overeign immunity rests on the assumption that ... the government should be able to weigh for itself whether submission to a traditional lawsuit would harm or promote the public interest."); Alden v. Maine, 527 U.S. 706, 750 (1999) ("Private suits against nonconsenting [sovereigns] ... may threaten [their] financial integrity ...."). So in the analogous context of suits against government officers, courts decide whether a suit is really against the sovereign by looking at whether a judgment would hit the public coffers. Dugan v. Rank, 372 U.S. 609, 620 (1963); Edelman v. Jordan, 415 U.S. 651, 663 (1974). Sovereign immunity is really immunity for the sovereign's treasury, so how a judgment would affect tribal finances may merit the most weight.
>
> In cases like this one, any tribal-immunity test regrettably must also serve another purpose: separating true arms of the tribe from shams. Unscrupulous lenders can seek out tribes to pose as figureheads, hide behind their sovereign immunity, and break state law scot-free. Unfortunately, these rent-a-tribe schemes do happen. Jayne Munger, Note, Crossing State Lines: The Trojan Horse Invasion of Rent-a-Bank and Rent-a-Tribe Schemes in Modern Usury Laws, 87 Geo. Wash. L. Rev. 468, 478-79 (2019). To reserve tribal sovereign immunity for tribal sovereigns, our test must sift out impostors.
>
> That may mean putting less weight on factors (1), (2), and (4). Whenever a non-tribal business gets a tribe to pose as a figurehead, both (1) and (4) will be met: The parties may be sure to incorporate the business under tribal law and to note the tribe's intent to extend it sovereign immunity. As for factor (2), the entity's purpose, it may be easy to dash off a document reciting that the business's purpose is helping a tribe. See People ex rel. Owen v. Miami Nation Enters., 2 Cal. 5th 222, 211 Cal. Rptr. 3d 837, 386 P.3d 357, 376, 378 (Cal. 2016) (even though firm's articles of incorporation listed purpose to help tribe, the "vast majority" of its revenue went to non-tribal partners). True, the other half of factor (2), how much the business serves that stated purpose, may prove relevant. And it can be revealing if an entity flunks any of these factors. But because these factors may come out identically for true tribal arms and for shams, we do not find it very informative when these easily checked boxes are checked easily.
>
> We thus apply the Breakthrough factors, emphasizing substance over form. At least on these facts, we pay particular attention to (3) and especially to (5). On each factor, GreatPlains bears the burden of showing that it favors immunity. Bowers v. NCAA, 475 F.3d 524, 546 n.25 (3d Cir. 2007).

44. An entity that "actually operates to enrich primarily persons outside the tribe or only a handful of tribal leaders" shows that it is not entitled to immunity. *People ex rel. Owen v. Miami Nation Enterprises*, 2 Cal. 5th 222, 211 Cal. Rptr. 3d 837, 386 P.3d 357 (2016).

45. These so-called "tribal lenders" usually do not survive scrutiny when examined closely, since virtually all business functions occur far from tribal land, by nontribal members, and overwhelmingly benefit non-tribal members to such a degree that tribal involvement is effectively nil.

46. Where non-tribal individuals and entities control and manage the substantive lending functions, provide the lending capital necessary to support the operation, and bear the economic risk associated with the operation, they are not in fact "operated" by Native American tribes and, therefore, are not shielded by sovereign immunity.

47. Further, sovereign immunity, even if legitimately invoked, still does not turn an otherwise illegal loan into a legal one. *See, e.g., United States v. Neff,* 787 F. App'x 81 (3d Cir. 2019) (upholding criminal convictions of two individuals engaged in an online payday lending rent-a-tribe scheme; sovereign immunity does not transform illegal loans into legal ones, and "reasonable people would know that collecting unlawful debt is unlawful").

48. Attempting to circumvent state interest rate caps by fraudulently hiding behind tribal sovereign immunity has been found to constitute criminal conduct. On October 13, 2017, a jury in the U.S. District Court for the Southern District of New York convicted Scott Tucker and Timothy Muir on 14 felony counts for their operation of a network of tribal lending companies. *See United States v. Tucker, et al.*, No. 1:16-cr-00091-PKC (S.D.N.Y). The conviction was affirmed in *United States v. Grote*, 961 F.3d 105 (2d Cir. 2020).

**DEFENDANTS' LOANS**

49. WLCC Lending JEM d/b/a Explore Credit makes loans via the website https://explorecredit.com/ to consumers at interest rates in excess of 700% annually. (Exhibit B)

50. On or about June 4, 2024, WLCC Lending JEM d/b/a Explore Credit made a loan

to Plaintiff (Exhibit A) for $500. The disclosed annual percentage rate was 782.07%.

51. The loan agreement (Exhibit A) is a standard form.

52. The loan was made for personal purposes and not for business purposes.

53. The principal amount was transferred to Plaintiff's bank account in Indiana via ACH.

54. The loan was made entirely via the Internet.

55. The loan was to be repaid via ACH.

56. Plaintiff made some of the payments, including interest.

57. Defendants' lending does not actually occur on the Tribe's reservation.

58. A significant majority of the transaction occurs within the State of Indiana—applying for the loan and receiving and collecting the funds.

59. The place where a consumer is located when he or she submits an application via an online portal with a Native American tribe determines where the transaction takes place for jurisdictional purposes. *California v. Iipay Nation of Santa Ysabel,* 898 F.3d 960, 968 (9th Cir. 2018) ("However, the patrons' act of placing a bet or wager on a game of DRB while located in California constitutes gaming activity that is not located on Indian lands, violates the UIGEA, and is not protected by IGRA.").

60. Plaintiff has never set foot on the Oglala Tribe's land.

61. Loans to Indiana residents made in the same manner as the loan to Plaintiff are governed by the laws of the State of Indiana.

## INDIANA REGULATION OF LENDING

62. The Indiana Uniform Consumer Credit Code, Ind. Code § 24-4.5-3-201, establishes a maximum loan finance charge of 36% per annum for consumer loans other than supervised loans.

63. For loans other than supervised loans, Ind. Code § 24-4.5-3-201 provides:

> (1) Except as provided in subsections (7) and (9), with respect to a consumer loan, other than a supervised loan (as defined in section 501 [IC 24-4.5-3-501] of this chapter), a lender may contract for a loan finance charge, calculated according to the actuarial method, not

exceeding twenty-five percent (25%) per year on the unpaid balances of the principal (as defined in section 107(3) [IC 24-4.5-3-107(3)] of this chapter). . . .

64. With respect to supervised loans, the Indiana Uniform Consumer Credit Code, Ind. Code § 24-4.5-3-508, provides:

Loan finance charge for supervised loans.

(1) With respect to a supervised loan, including a loan pursuant to a revolving loan account, a supervised lender may contract for and receive a loan finance charge not exceeding that permitted by this section.

(2) The loan finance charge, calculated according to the actuarial method, may not exceed the equivalent of the greater of:

(a) the total of:

(i) thirty-six percent (36%) per year on that part of the unpaid balances of the principal (as defined in section 107(3) [IC 24-4.5-3-107(3)] of this chapter) which is two thousand dollars ($2,000) or less;

(ii) twenty-one percent (21%) per year on that part of the unpaid balances of the principal (as defined in section 107(3) of this chapter) which is more than two thousand dollars ($2,000) but does not exceed four thousand dollars ($4,000); and

(iii) fifteen percent (15%) per year on that part of the unpaid balances of the principal (as defined in section 107(3) of this chapter) which is more than four thousand dollars ($4,000); or

(b) twenty-five percent (25%) per year on the unpaid balances of the principal (as defined in section 107(3) of this chapter). . . .

65. There is also a provision for small loans, Ind. Code § 24-4.5-7-101 *et seq*., but it does not authorize Defendants' rates, and requires that small loans conform to other requirements that Defendants' loans do not comply with.

66. Ind. Code. § 24-4.5-7-201, "Limitations on finance charges," provides:

(1) Finance charges on the first two hundred fifty dollars ($250) of a small loan are limited to fifteen percent (15%) of the principal.

(2) Finance charges on the amount of a small loan greater than two hundred fifty dollars ($250) and less than or equal to four hundred dollars ($400) are limited to thirteen percent (13%) of the amount over two hundred fifty dollars ($250) and less than or equal to four hundred dollars ($400).

(3) Finance charges on the amount of the small loan greater than four hundred dollars ($400) and less than or equal to five hundred fifty dollars ($550) are limited to ten percent (10%) of the amount over four hundred dollars ($400) and less than or equal to five hundred fifty dollars ($550).

(4) The amount of five hundred fifty dollars ($550) in subsection (3) is subject to change under the provisions on adjustment of dollar amounts (IC 24-4.5-1-106). However, notwithstanding IC 24-4.5-1-106(1), the Reference Base Index to be used under this subsection is the Index for October 2006.

67. The amount of finance charge provided for in Exhibit A is more than double that permitted in Indiana under any provision.

68. Ind. Code § 24-4.5-1-201, "Territorial application," provides:

(1) Except as otherwise provided in this section, this article applies to sales, leases, and loans made in this state and to modifications, including refinancings, consolidations, and deferrals, made in this state, of sales, leases, and loans, wherever made. For purposes of this article, the following apply: . . .

(c) A loan or modification of a loan agreement is made in this state if a writing signed by the debtor and evidencing the debt is received by the lender or a person acting on behalf of the lender in this state.

(d) Except as provided in subdivisions (e) and (f), a sale, lease, or loan transaction occurs in Indiana if a consumer who is a resident of Indiana enters into a consumer sale, lease, or loan transaction with a creditor or a person acting on behalf of the creditor in another state and the creditor or the person acting on behalf of the creditor has advertised or solicited sales, leases, or loans in Indiana by any means, including by mail, brochure, telephone, print, radio, television, the Internet, or electronic means.

(e) A sale, lease, or loan transaction does not occur in Indiana if a consumer who is a resident of Indiana enters into a consumer sale, lease, or loan transaction secured by an interest in land located outside Indiana.

(f) A sale, lease, or loan transaction does not occur in Indiana if a consumer who is a resident of Indiana enters into a consumer sale, lease, or loan transaction at a creditor's place of business in another state.

For purposes of subdivisions (a) through (c), an offer is received by a creditor or a person acting on behalf of the creditor in Indiana if the offer is physically delivered, or otherwise transmitted or communicated, to a person who has actual or apparent authority to act for the creditor or the person acting on behalf of the creditor in Indiana, regardless of whether approval, acceptance, or ratification by any other agent or representative of the creditor or the person acting on behalf of the creditor in another state is necessary to give legal consequence to the consumer credit transaction. . . .

(5) Notwithstanding other provisions of this section:

(a) except as provided in subsection (2), this article does not apply if the buyer, lessee, or debtor is not a resident of this state at the time of a credit transaction and the parties then agree that the law of the buyer's, lessee's, or debtor's residence applies; and

(b) this article applies if the buyer, lessee, or debtor is a resident of this state at the time of a credit transaction and the parties then agree that the law of this state applies.

(6) Except as provided in subsection (5), the following agreements by a buyer, lessee, or debtor are invalid with respect to consumer credit sales, consumer leases, consumer loans, or modifications thereof, to which this article applies:

(a) An agreement that the law of another state shall apply.

(b) An agreement that the buyer, lessee, or debtor consents to the jurisdiction of another state.

(c) An agreement that fixes venue. . . .

(8) If a creditor or a person acting on behalf of the creditor has violated the provisions of this article that apply to the authority to make consumer loans (IC 24-4.5-3-502), the loan is void and the debtor is not obligated to pay either the principal or loan finance charge, as set forth in IC 24-4.5-5-202.

69. Ind. Code § 24-4.5-5-202, "Effect of violations on rights of parties," provides:

. . . (3) A debtor is not obligated to pay a charge in excess of that allowed by this Article, and ***if the debtor has paid an excess charge the debtor has a right to a refund***. A refund may be made by reducing the debtor's obligation by the amount of the excess charge. If the debtor has paid an amount in excess of the lawful obligation under the agreement, the debtor may recover the excess amount from the person who made the excess charge or from an assignee of that person's rights who undertakes direct collection of payments from or enforcement of rights against debtors arising from the debt.

(4) ***If a debtor is entitled to a refund and a person liable to the debtor refuses to make a refund within a reasonable time after demand, the debtor may recover from that person a penalty in an amount determined by a court not exceeding the greater of either the amount of the credit service or loan finance charge or ten (10) times the amount of the excess charge. If the creditor has made an excess charge in deliberate violation of or in reckless disregard for this Article, the penalty may be recovered even though the creditor has refunded the excess charge.*** No penalty pursuant to this subsection may be recovered if a court has ordered a similar penalty assessed against the same person in a civil action by the department (IC 24-4.5-6-113). With respect to excess charges arising from sales made pursuant to revolving charge accounts or from loans made pursuant to revolving loan accounts, no action pursuant to this subsection may be brought more than two (2) years after the time the excess charge was made. With respect to excess charges arising from other consumer credit sales or consumer loans, no action pursuant to this subsection may be brought more than one (1) year after the due date of the last scheduled payment of the agreement pursuant to which the charge was made. . . .

(7) If the creditor establishes by a preponderance of evidence that a violation is unintentional or the result of a bona fide error, no liability is imposed under subsections (1), (2), and (4) and the validity of the transaction is not affected.

(8) In any case in which it is found that a creditor has violated this Article, the court may award ***reasonable attorney's fees*** incurred by the debtor. . . . (Emphasis added)

70. The excessive interest charges imposed by Defendants were willful. Defendants were warned of their illegal nature prior to the loan to Plaintiff. (Exhibit C)

**COUNT I – INDIANA UNIFORM CONSUMER CREDIT CODE**

71. Plaintiff incorporates paragraphs 1-70.

72. This claim is against all Defendants.

73. Because the loan made to Plaintiff violated the rate limits set by Indiana law, and the violation was intentional, Plaintiff and other borrowers are entitled to ten (10) times the amount of the excess charge.

**CLASS ALLEGATIONS**

74. Plaintiff brings this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

75. The class consists of (a) all individuals with Indiana addresses (b) to whom a loan was made via the website https://explorecredit.com/ at more than 36% interest (all of its loans qualify) (c) on or after a date two years prior to the filing of this action.

76. Plaintiff may alter the class definition to conform to developments in the case and discovery.

77. The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least forty class members.

78. There are questions of law and fact common to the class members, which common

questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

79. Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

80. Plaintiff's claims are typical of the claims of the class members. All are based on the same factual and legal theories.

81. A class action is superior for the fair and efficient adjudication of this matter, in that:

a. Individual actions are not economically feasible.

b. Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

i. Statutory damages;

ii. Attorney's fees, expenses and costs; and

iii. Such other or further relief as is appropriate.

**COUNT II – RICO**

82. Plaintiff incorporates paragraphs 1-70.

83. This claim is against Hive Financial Systems, LLC, Crandall, Raines, and John Does 1-20, who are the RICO "persons."

84. All loans made via the website https://explorecredit.com/ to Indiana residents are (a) unenforceable under Indiana law in whole or in part as to principal or interest because of the laws relating to usury, and (b) were incurred in connection with the business of lending money at a rate usurious under Indiana law, where (c) the usurious rate is at least twice the enforceable rate (36%).

85. The loans are therefore "unlawful debts" as defined in 18 U.S.C. § 1961(6).

86. WLCC Lending JEM d/b/a Explore Credit, is an enterprise affecting interstate

commerce, in that it is located outside of Indiana and makes loans to Indiana residents via the Internet.

87. Defendants against Hive Financial Systems, LLC, Crandall, Raines, and John Does 1-20 are associated with this enterprise.

88. Defendants Hive Financial Systems, LLC, Crandall, Raines, and John Does 1-20 conducted or participated in the conduct of the affairs of WLCC Lending JEM d/b/a Explore Credit through a pattern of collection of unlawful debt, as set forth above, in violation of 18 U.S.C. §1962(c).

89. Plaintiff was deprived of money as a result.

**CLASS ALLEGATIONS**

90. Plaintiff brings this claim on behalf of a class.

91. The class consists of (a) all individuals with Indiana addresses (b) to whom a loan was made via the website https://explorecredit.com/ at more than 36% interest (all of its loans qualify) (c) which loan was made on or after a date 4 years prior to the filing of suit.

92. The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least forty class members.

93. There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are:

a. Whether the loans at issue are "unlawful debts" as defined in RICO.

b. Whether WLCC Lending JEM d/b/a Explore Credit, is an "enterprise."

c. Whether Defendants Hive Financial Systems, LLC, Crandall, Raines, and John Does 1-20 are associated with the enterprise.

d. Whether Defendants Hive Financial Systems, LLC, Crandall, Raines, and John Does 1-20 conducted or participated in the affairs of WLCC Lending

JEM d/b/a Explore Credit through a pattern of making and collecting unlawful loans.

94. Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

95. Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

96. A class action is superior for the fair and efficient adjudication of this matter, in that:

a. Individual actions are not economically feasible.

b. Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants Hive Financial Systems, LLC, Crandall, Raines, and John Does 1-20 for:

i. Treble damages;

ii. Attorney's fees, litigation expenses and costs of suit; and

iii. Such other or further relief as the Court deems proper.

*/s/Daniel A. Edelman*
Daniel A. Edelman

Daniel A. Edelman
Heather Kolbus
Alexandra Huzyk
**EDELMAN, COMBS, LATTURNER & GOODWIN, LLC**
20 South Clark Street, Suite 1800
Chicago, IL 60603-1841
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service: courtecl@edcombs.com
Dedelman@edcombs.com
hkolbus@edcombs.com
ahuzyk@edcombs.com

**JURY DEMAND**

Plaintiff demands trial by jury.

*/s/Daniel A. Edelman*
Daniel A. Edelman

**NOTICE OF ASSIGNMENT**

Please be advised that all rights relating to attorney's fees have been assigned to counsel.

*/s/Daniel A. Edelman*
Daniel A. Edelman

## DOCUMENT PRESERVATION DEMAND

Each Plaintiff hereby demands that each Defendant take affirmative steps to preserve all recordings, data, documents, and all other tangible things that relate to Plaintiff, class members, the events described herein, any third party associated with any telephone call, campaign, account, loan, sale or file associated with Plaintiff, and any account or loan or number or symbol relating to them. These materials are likely very relevant to the litigation of this claim. If any Defendant is aware of any third party that has possession, custody, or control of any such materials, Plaintiff demands that Defendant request that such third party also take steps to preserve the materials. This demand shall not narrow the scope of any independent document preservation duties of the Defendant.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

T:\42060\Pleading\Complaint DAE 11-19-25_Pleading.wpd